

FILED

Sep 14 2023, 9:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Jan B. Berg<br>Indianapolis, Indiana | Jenny R. Buchheit<br>Sean T. Dewey<br>Alexandria H. Pittman<br>Ice Miller LLP<br>Indianapolis, Indiana |

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of:<br><br>M.T.,<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Community Health Network,<br><br>*Appellee-Petitioner* | September 14, 2023<br><br>Court of Appeals Case No.<br>23A-MH-341<br><br>Appeal from the Marion Superior Court<br><br>The Honorable David J. Certo, Judge<br><br>Trial Court Cause No.<br>49D08-2301-MH-2458 |

**Opinion by Judge Mathias**
Judges Vaidik and Pyle concur.

**Mathias, Judge.**

[1]  In *In re Commitment of C.P.*, ___ N.E.3d ___, No. 22A-MH-2960 (Ind. Ct. App. Sept. 14, 2023), we held that an appeal from an expired involuntary civil

commitment order was not moot and was properly before us based on the negative collateral consequences that that respondent may face under federal and state firearm restrictions that accompany involuntary civil commitment orders. Here, we hold, based on the facts established in the record and the attendant briefing, that this appeal from an expired involuntary civil commitment order is not moot. Rather, it is properly before us based on the negative collateral consequences that the respondent, M.T., may face with respect to future involuntary civil commitment proceedings if the instant commitment order were invalid and left undisturbed. However, on the merits of this appeal, we hold that Community Health Network presented sufficient evidence to support M.T.'s temporary commitment.

## Facts and Procedural History

[2] M.T. has a history of mental illness and has previously been diagnosed with Schizophrenia, for which he has been prescribed medication. Since July 2022, M.T. has lived with his parents in their home. During that time, M.T. did not take his prescription medication, and his behavior "progressively got[] worse." Tr. Vol. 2, p. 12. M.T. would go two-to-three weeks without changing his clothes. He would not sleep for up to three days on end, and, instead of sleeping, M.T. would "stand in the middle of the hallway and stare at the wall." *Id.* at 13. M.T. also did not eat regularly, sometimes going days without eating, and, aside from occasionally making himself a bowl of cereal, his food was prepared by his mother.

[3] Sometime in January 2023, M.T.'s mother attempted to make a phone call, and M.T. "tried to grab the phone away from her forcefully." *Id.* at 14. M.T. then "took off" out of the front door even though he was not "dressed for January weather." *Id.* at 15. M.T., who was unemployed, did not have identification or money with him. M.T.'s parents and brother "drove around" and "look[ed] for him" for six to eight hours, but they were unable to locate him. *Id.* M.T.'s father was concerned for M.T. because M.T. was not able to "live independently" from his parents and their home. *Id.* at 17.

[4] On January 15, M.T. appeared at a pizzeria and told staff that he had hit his head and was confused. M.T. was then transported to a nearby emergency department. After doctors there were unable to identify a physical injury, they had him moved to Fairbanks Behavioral Health within the Community Health Network ("Community Health").

[5] There, Dr. Ishrat Bhat examined M.T. and diagnosed him with Schizophrenia, post-traumatic stress disorder, and catatonia. In reaching those conclusions, Dr. Bhat relied on M.T.'s record of "previous hospitalizations" for mental-health issues, which had started in 2017. *Id.* at 21. Those prior hospitalizations included an August 2022 hospitalization.[1] M.T.'s medical records indicated Schizophrenia, and Dr. Bhat opined that the "five . . . year[]" timeline of

---

[1] It is not clear from the record on appeal whether any of M.T.'s prior hospitalizations were involuntary.

M.T.'s mental-health records and hospitalizations was "enough to establish a diagnosis of Schizophrenia." *Id.*

[6] Dr. Bhat also based his diagnosis of Schizophrenia on his own observations. Those observations included M.T.'s "disorganized" behavior and speech, "catatonic" behavior, and "negative symptoms of Schizophrenia," namely, "apathy, social withdraw[al], . . . being quiet, poor self-care," and lack of pleasure. *Id.* at 22. Dr. Bhat concluded that M.T. lacks insight into his own mental illness and that M.T.'s lack of insight results in M.T. not taking his prescribed medication or being able to take care of himself. Dr. Bhat further concluded that, due to M.T.'s mental illness, M.T. is unable to provide himself with food, clothing, shelter, and other essential human needs and also that M.T.'s mental illness causes M.T. to suffer a substantial impairment of his judgment, reasoning, or behavior that results in his inability to function independently.

[7] Community Health then petitioned for M.T.'s involuntary temporary commitment in order to re-establish M.T.'s routine with his prescription medication. Dr. Bhat testified in support of M.T.'s temporary commitment. In addition to the reasons for his diagnoses and M.T.'s mental-health history, Dr. Bhat noted that a ninety-day commitment would be necessary for M.T. because, "usually if someone has been in a state of psychosis or catatonia for a long time, it takes a while for them to get better and to get stabilized." *Id.* at 26. M.T.'s father also testified in support of M.T.'s commitment. M.T. testified against his own commitment and denied suffering from mental illness.

Following the fact-finding hearing, the court found that M.T. was gravely disabled. The court then granted Community Health's petition for M.T.'s involuntary temporary commitment. M.T. now appeals that order, and he timely filed his notice of appeal. On April 24, 2023, hardly more than one week before M.T.'s initial brief in our Court was due, his ninety-day term of commitment expired.

## 1. Where, as here, commitment orders carry consequences beyond the terms of the commitments and appellate review can provide meaningful relief from those collateral consequences, appeals from expired involuntary civil commitment orders are not moot, and they are properly before us on their merits.

In *C.P.*, we explained that, while our Court has traditionally considered appeals from expired involuntary civil commitment orders to be moot, at least until 2019 we had nonetheless "routinely considered the merits" of those appeals. *E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022) (per curiam). However, in more recent years, various panels of our Court have dismissed these appeals on the theory that there is no meaningful relief that can be had by our review of them. *See, e.g.*, *In re Commitment of J.G.*, 209 N.E.3d 1206, 1210-11 (Ind. Ct. App. 2023).

Yet, we also explained in *C.P.* that our Supreme Court's opinions in this area have made it a point to leave open the possibility of an alternative analytical framework in which to reach the merits of expired involuntary civil

commitment orders on appeal. In particular, our Supreme Court has "left open the possibility that respondents in [temporary-commitment appeals] could seek relief" from allegedly invalid orders due to any "harmful collateral consequences" that accompany such orders. *E.F.*, 188 N.E.3d at 466; *In re Commitment of T.W.*, 121 N.E.3d 1039, 1044 n.5 (Ind. 2019). In *C.P.*, we held that the respondent had successfully demonstrated one such negative collateral consequence, namely, that his involuntary civil commitment would make it a violation of federal and state criminal law for him to carry a handgun. *C.P.*, ___ N.E.3d at ___.

[11] M.T. raises a different negative collateral consequence for our consideration, one we passed over in *C.P. See id.* at ___ n.2. In particular, M.T. asserts that the order for his involuntary temporary commitment, if invalid but left in place, would add to the history of hospitalizations on his medical record and make future involuntary commitment proceedings against him more likely to be successful. We agree, and we therefore conclude that this negative collateral consequence M.T. potentially faces makes our review of his involuntary temporary commitment order meaningful and not moot.

[12] As we explained in *C.P.*:

> Indiana's appellate courts have applied the "collateral consequences" doctrine to hold that appeals are not moot where meaningful relief may still be had by our review of those appeals on their merits. For example, in *In re S.D.*, our Supreme Court considered the validity of a Child in Need of Services ("CHINS") adjudication. 2 N.E.3d 1283 (Ind. 2014). However, while the

appeal was pending, the child was returned to her mother's care, and the CHINS case was closed. Accordingly, the Indiana Department of Child Services ("DCS") moved to dismiss the appeal as moot.

Our Supreme Court held that the appeal was not moot based on the following "long-lasting collateral consequences" that accompany CHINS adjudications:

> a CHINS finding can relax the State's burden for terminating parental rights. Under Indiana Code section 31-35-2-4(b)(2)(B)(iii) (Supp. 2013), the State may terminate parental rights if a child has been adjudicated [a] CHINS on two prior occasions, without proving either that the conditions resulting in a child's removal will not be remedied or that continuing the parent-child relationship threatens the child's well-being. And a prior CHINS finding may have adverse job consequences as well, such as precluding Mother from employment with any DCS contractor. *See generally* Ind. Dept. of Child Servs., Ind. Child Welfare Policy Manual § 13.4 (2013), available at http://www.in.gov/dcs/files/ 13.4_Evaluation_of_Background_Checks_ for_DCS_Contractors.pdf. Similarly, a CHINS finding may preclude her from become a licensed foster parent. *Id.* at § 13.10, available at http://www.in. gov/dcs/files/ 13_10_Evaluating_Background_Checks_for_Foster_Famil y_Licensing. pdf. *Reversal cannot change the efforts Mother expended in complying with the CHINS case, but it still affords her meaningful relief by lifting those collateral burdens*. We therefore decline to find the case moot.

*Id.* at 1285, 1290 (emphasis added).

Our appellate courts have likewise repeatedly invoked the collateral-consequences doctrine to review the merits of appeals where the order at issue, if invalid and left undisturbed, could contribute to a future adverse finding against the appellant. *See, e.g.*, *Smith v. State*, 971 N.E.2d 86, 89 (Ind. 2012) (reviewing the merits of the trial court's finding that the defendant had violated the conditions of his placement in community corrections due to possible "negative collateral consequences" from such a finding, even though the defendant had "served his sentence"); *Hamed v. State*, 852 N.E.2d 619, 622-23 (Ind. Ct. App. 2006) (reviewing the merits of an expired no contact order because, if a violation of the order were later alleged, it could contribute to a contempt proceeding or a criminal charge); *Kirby v. State*, 822 N.E.2d 1097, 1101 n.4 (Ind. Ct. App. 2005) (reviewing the merits of a post-conviction petition, even though the sentence for the underlying conviction had been served, because "convictions have collateral consequences inasmuch as they . . . may form the basis of a habitual offender enhancement"), *trans. denied*; *McBain v. Hamilton Cnty.*, 744 N.E.2d 984, 987-88 (Ind. Ct. App. 2001) (reviewing the merits of a tax sale, even though the original owners had redeemed their property, based in part on "negative collateral consequences that would be unjustified if the sale w[ere] invalid . . . ."); *Roark*, 551 N.E.2d at 867-68 (reviewing the merits of a CHINS adjudication, despite the matter being closed, "because of the potentially devastating consequences" of the adjudication); *In re Marriage of Stariha*, 509 N.E.2d 1117, 1123 (Ind. Ct. App. 1987) (holding that a father's appeal of his contempt conviction for failure to pay child support was not moot, even though his sentence had been served, because of "possible collateral consequences"); *see also S.D.*, 2 N.E.3d at 1290 (holding that a closed CHINS case is not moot in part because a CHINS adjudication can result in "relax[ing] the State's burden for terminating parental rights").

*Id.* at ___.

[13]     M.T.'s involuntary civil commitment order carries at least one similar and significant negative collateral consequence. We have long recognized that a "history of mental illness requiring hospitalizations" may be probative of whether a person is "gravely disabled and should be involuntarily committed." *Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004), *trans. denied*. Thus, as M.T. notes in his brief on appeal, a respondent's history of being committed may contribute to a future serious adverse finding that he again should be committed. That consequence, which is adequately developed in the record and in the briefing here, is sufficient to place M.T.'s appeal from his expired involuntary civil commitment order within Indiana's case law that such appeals are not moot under the collateral-consequences doctrine. *See, e.g.*, *S.D.*, 2 N.E.3d at 1290; *Kirby*, 822 N.E.2d at 1101 n.4.

[14]     Indeed, Dr. Bhat's testimony in support of Community Health's petition for M.T.'s involuntary commitment proves the point. In his testimony, Dr. Bhat emphasized M.T.'s record of "previous hospitalizations" for mental-health issues, which dated back to 2017 and included an August 2022 hospitalization. Tr. Vol. 2, p. 21. Dr. Bhat opined that the five-year timeline of M.T.'s prior hospitalizations "establish[d]" M.T.'s "diagnosis of Schizophrenia." *Id.* And Dr. Bhat further opined that the term of the requested commitment order here would be necessary because, "usually if someone has been in a state of psychosis or catatonia for a long time, it takes a while for them to get better and to get stabilized." *Id.* at 26.

Thus, M.T.'s medical history, including his prior hospitalizations, was relevant to Dr. Bhat's diagnosis of M.T. and to Dr. Bhat's recommended treatment plan for M.T. If the instant order were invalid but not reviewed in this appeal, it would potentially contribute to that evidence against M.T. in a future commitment proceeding just as his existing history contributed to the evidence against him here. Our review of the instant order is therefore an opportunity for meaningful relief to M.T.

Still, Community Health asserts that our holding that M.T.'s appeal is meaningful and not moot is contrary to our Supreme Court's opinion in *E.F.* But Community Health is mistaken. In *E.F.*, our Supreme Court expressly said that any possible collateral-consequences analysis in temporary-commitment appeals was "left open." 188 N.E.3d at 466. Community Health interprets that language to mean that in fact any such analysis was closed shut. We think that, if our Supreme Court had intended that outcome, it would have explicitly said so.

Community Health further asserts that our holding for M.T. will effectively make every appeal from an expired involuntary civil commitment order not moot. We also addressed this assertion in *C.P.* As we noted there, while "[o]ur Supreme Court's analysis" in its most recent opinion on collateral consequences was based on the consequences "that attach to *any*" orders of the type on appeal and "was not based on a showing of specific facts," we need not go so far to decide this appeal. *See C.P.*, ___ N.E.3d at ___ n.1 (discussing *S.D., 2 N.E.3d at 1285-86, 1290*); *see also id.* at ___ (collecting cases). Instead, and as in *C.P.*, "we

limit our holding to these specific facts and need not reach the question of whether the same showing" M.T. makes here "would suffice to enable appellate review of the merits of every involuntary civil commitment order." *Id.* at ___ n.1.

[18] We therefore proceed to the merits of this appeal.

## 2. Community Health presented sufficient evidence to support M.T.'s temporary commitment.

[19] On the merits of his appeal, M.T. contends that Community Health failed to present sufficient evidence to support his temporary commitment. In our review of such issues, we consider "only that evidence most favorable to the judgment, along with" the reasonable inferences therefrom. *In re Commitment of T.K.*, 27 N.E.3d 271, 274 (Ind. 2015) (cleaned up). We will not reweigh the evidence or reassess witness credibility on appeal. *Id.* at 273. It is the petitioner's burden in the trial court to support the petition for an involuntary civil commitment by clear and convincing evidence. *Id.*

[20] To support its petition for M.T.'s involuntary temporary commitment, Community Health was required to show that M.T. was (1) mentally ill; (2) *either* dangerous *or* gravely disabled; and (3) that his commitment was appropriate. I.C. § 12-26-2-5(e) (2022) (emphasis added). M.T. challenges only whether Community Health's evidence was sufficient to show that he was gravely disabled. According to Indiana Code section 12-7-2-96 (2022), "gravely disabled," as relevant to our analysis here, "means a condition in which an

individual, as a result of mental illness, is in danger of coming to harm because the individual . . . has a substantial impairment . . . of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently."

[21] Community Health presented sufficient evidence to show that M.T. was gravely disabled. M.T. has an established history of Schizophrenia, with multiple hospitalizations going back more than five years. He has been prescribed medication for that diagnosis. However, in July 2022, he ceased taking his prescription. Around that same time, his behaviors "progressively got[] worse." Tr. Vol. 2, p. 12. M.T. went weeks without changing clothes, days without sleeping, did not eat regularly, and had to have most meals prepared for him.

[22] In January 2023, after "forcefully" trying to grab his mother's phone from her, M.T. "took off" out of his parents' house even though he was not "dressed for January weather." *Id.* at 14-15. Sometime thereafter, he appeared at a pizzeria confused, which resulted in him being transported to Fairbanks Behavioral Health. And, there, Dr. Bhat observed M.T.'s "disorganized" behavior and speech, "catatonic" behavior, and "negative symptoms of Schizophrenia," namely, "apathy, social withdraw[al], . . . being quiet, poor self-care," and lack of pleasure. *Id.* at 22.

[23] Dr. Bhat concluded that M.T. lacks insight into his own mental illness and that M.T.'s lack of insight results in M.T. not taking his prescribed medication or

being able to take care of himself. Dr. Bhat also opined that M.T.'s mental illness causes M.T. to suffer a substantial impairment of his judgment, reasoning, or behavior that results in his inability to function independently. M.T.'s father likewise testified that M.T. was not able to "live independently" from his parents and their home. *Id.* at 17.

A reasonable fact-finder could conclude from those facts that M.T. was gravely disabled. And M.T.'s arguments to the contrary on appeal simply seek to have this Court reweigh the evidence, which we will not do. We affirm the trial court's judgment.

## Conclusion

For all of these reasons, we hold that M.T.'s appeal of his temporary-commitment order is not moot, even though the term of his commitment has expired, based on the collateral consequences that accompany his order of involuntary civil commitment. On the merits of this appeal, we hold that Community Health presented sufficient evidence to support the trial court's order that M.T. be committed for not more than ninety days. Accordingly, we affirm the trial court's judgment.

Affirmed.

Vaidik, J., and Pyle, J., concur.